**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| KARMEL AL HAJ and TIMOTHY A. WOODHAMS, individually and on behalf of all others similarly situated, | No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| PFIZER INC., | |
| Defendant. | |

Plaintiffs, Karmel Al Haj and Timothy A. Woodhams, individually and on behalf of all others similarly situated, for their Class Action Complaint against Defendant Pfizer Inc. ("Pfizer"), based upon personal knowledge as to their own actions and based upon the investigation of counsel with respect to all other matters, complains as follows:

## I.    INTRODUCTION

1.    Pfizer sold and marketed directly to Plaintiffs and the Class an over-the-counter medication known as Maximum Strength Robitussin Cough+Chest Congestion DM ("Maximum Strength Robitussin"), containing two active ingredients which act as a cough suppressant (Dextromethorphan HBr) and an expectorant (Guaifenesin) respectively.

2.    Despite the fact that Maximum Strength Robitussin is typically more expensive at retail than regular strength Robitussin Cough+Chest Congestion DM ("Regular Strength Robitussin"), Maximum Strength Robitussin contains one-half the amount of cough suppressant per 10 ml and the same amount of expectorant per 10 ml as Regular Strength Robitussin.

3.      Moreover, based on the dosing recommendations, for the same-size four (4) fluid ounce bottle, Maximum Strength Robitussin provides just 5.91 doses whereas Regular Strength Robitussin provides 11.8 doses.

4.      By specifically naming Maximum Strength Robitussin with a plain-meaning efficacy claim, Pfizer intended that consumers believe that they would get more active ingredient than in the regular version of Robitussin. In fact, purchasers of Maximum Strength Robitussin receive 10 mg of cough suppressant per 10 ml as compared to 20 mg per 10 ml in Regular Strength Robitussin and 200 mg of expectorant per 10 ml just like in the Regular Strength Robitussin. Plaintiff and the Class thus did not receive more of the active ingredients in the maximum strength product versus the regular strength product, and were thus actually deceived.

5.      Plaintiff and the Class have been damaged by Pfizer's actions. Plaintiffs bring this action under state consumer protection statutes, for breach of warranty, and for unjust enrichment, because Plaintiffs and the Class Members did not receive the benefit of the bargain and/or suffered out of pocket loss, and are entitled to recover compensatory damages, trebling where permitted, and attorneys' fees and costs.

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Class is a citizen of a State different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.  Plaintiffs allege that the total claims of individual Class members in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §§ 1332(d)(2) and (6).  Plaintiffs are

- 2 -

citizens of Illinois and Michigan, respectively, whereas Pfizer is a citizen of Delaware and New York for purposes of diversity. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A). Furthermore, Plaintiffs allege that more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of a state other than Illinois, where this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

7.       Venue is appropriate in this District because Plaintiff Karmel Al Haj lives here and Defendant does business within this District.

### III.     PARTIES

8.       Plaintiff Karmel Al Haj is a citizen and resident of the State of Illinois. Plaintiff purchased an 8 fluid ounce bottle of Maximum Strength Robitussin at Walmart on April 16, 2017 for $9.96, which was more than the price of Regular Strength Robitussin. Plaintiff purchased Maximum Strength Robitussin based on Pfizer's representation that the product was, in fact, maximum strength, containing more of the active ingredients than in the regular version of Robitussin. Plaintiff was actually deceived, and damaged by Pfizer's misrepresentations.

9.       Plaintiff Timothy A. Woodhams is a citizen and resident of the State of Michigan. Plaintiff purchased an 8 fluid ounce bottle of Maximum Strength Robitussin at Harding's Market on December 23, 2016 for $10.99, which was $2.00 more than the Regular Strength Robitussin. Plaintiff purchased Maximum Strength Robitussin based on Pfizer's representation that the product was, in fact, maximum strength, containing more of the active ingredients than in the regular version of Robitussin. Plaintiff was actually deceived, and damaged by Pfizer's misrepresentations.

10.       Defendant Pfizer Inc. is a Delaware corporation with its principal place of business located in New York, New York. Pfizer's Consumer Healthcare division maintains its

- 3 -

principal place of business at and distributes its Robitussin line of products from 1 Giralda Farms, Madison, New Jersey. Pfizer states on its website: "Pfizer Consumer Healthcare (PCH) is among the largest over-the-counter (OTC) health care companies in the world with a global footprint in more than 90 countries."[1]

## IV.    FACTS

### A.    Background on Over-the-Counter Cough Medications

11.    Cough medications are classified as antitussives and expectorants.

12.    Antitussives, such as dextromethorphan ("DXM") work by directly affecting CNS sites that regulate the cough reflex.[2] More than 120 cough preparations contain DXM, which received FDA approval in 1958 as a non-addictive replacement for codeine.

13.    DXM is considered safe and effective at recommended doses with minimal adverse effects, and has thus become the most widely used cough suppressant in the United States.[3] Dextromethorphan Hydrobromide ("DXM Hbr") Syrup is a combination of an antihistamine and a cough suppressant used to treat cough, itching, runny nose, sneezing, and itchy or watery eyes caused by colds or allergies.[4]

14.    The recommended dosage of DXM is 10 to 20 mg orally every 4 hours or 30 mg orally every 6 to 8 hours. The maximum dosage per day is 120 mg in 24 hours.[5]

15.    Only one expectorant, guaifenesin, is used in OTC products. Guaifenesin is thought to thin bronchial secretions and make coughing more productive.[6]

---

[1] http://www.pfizer.com/partners/consumer-healthcare (last accessed August 10, 2017).

[2] Susan Louisa Montauk, M.D. and Peter H. Rheinstein, M.D., J.D., M.S., Appropriate Use of Common OTC Analgesis and Cough and Cold Medicines, Monograph No. 1 (American Academy of Family Physicians 2002).

[3] http://abcnews.go.com/Health/Wellness/dextromethorphan-ingredient-robutussin-cough-medicines-escapes-fda-restrictions/story?id=11638160 (last accessed August 10, 2017).
[4] http://www.rxlist.com/promethazine-hcl-and-dextromethorphan-hydrobromide-syrup-side-effects-drug-center.htm (last accessed August 10, 2017). *See also* http://www.mayoclinic.org/drugs-supplements/dextromethorphan-oral-route/proper-use/drg-20068661 (last accessed August 10, 2017).

[5] https://www.drugs.com/dosage/dextromethorphan.html (last accessed August 10, 2017).

- 4 -

16.     The recommended dosage of guaifenesin is 200 to 400 mg orally every 4 hours as needed, not to exceed 2.4 g/day.[7]

**B.     Pfizer Markets Regular and Maximum Strength Robitussin Containing The Same Types of Cough Suppressant and Expectorant**

17.     Pfizer distributes, markets and sells Regular Strength Robitussin for the relief of cough and mucus. As reflected on the front of the box, Regular Strength Robitussin contains the active ingredients DMX Hbr and Guaifenesin:



18.     In a nearly identical box, Pfizer distributes, markets and sells Maximum Strength Robitussin for the control of cough, relief of chest congestion, and to thin and loosen mucus. As

---

[6] *Id.*

[7] https://www.drugs.com/dosage/guaifenesin.html

reflected on the front of the box, Maximum Strength Robitussin also contains the active

ingredients DMX Hbr and Guaifenesin:



19.     The material difference between the boxes for the two products is the large red

bar that states "MAXIMUM STRENGTH" on Maximum Strength Robitussin and the inclusion

of the word "MAX" in capitalized, red letters under "DM" as well as red bars over and under the

green wave designs.

20.     According to Consumer Reports, "maximum strength" on a drug label means:

"***You'll get more of the active ingredient than in the regular version***, but you won't necessarily

get the maximum dose you can buy."[8]

---

[8] https://www.consumerreports.org/cro/2012/11/what-extra-strength-on-a-drug-label-really-means/index.htm; https://consumerist.com/2012/09/25/fun-with-reading-labels-what-does-extra-strength-actually-mean/ (last accessed August 10, 2017) (emphasis supplied).

21.     Here, Pfizer intended consumers rely on the term "maximum strength" to mean that Maximum Strength Robitussin contains more of the active ingredients than Regular Strength Robitussin. Pfizer further intended consumers to pay more for Maximum Strength Robitussin, based on the representation that it contained more of the active ingredients than Regular Strength Robitussin. In fact, as set forth below, it does not and thus the use of the term "maximum strength" was deceptive and misleading.

**C.     Pfizer Deceived Plaintiff and the Class Because Maximum Strength Robitussin Does not Contain More of the Active Ingredients Than Regular Strength**

22.     While the Federal Food and Drug Administration has not provided express guidance on the use of the phrase "maximum strength" on over-the-counter drug labels, the FDA directs that drug labels may not be misleading.

23.     Sec. 201.10(c) of the Federal Food, Drug, and Cosmetic Act provides in pertinent part: "The labeling of a drug may be misleading by reason (among other reasons) of: … (2) Failure to reveal the proportion of, or other fact with respect to, an ingredient present in such drug, when such proportion or other fact is material in the light of the representation that such ingredient is present in such drug."

24.     With respect to the phrase "maximum strength," the Canadian Minister of Health has explained:

> The term "maximum strength" may be misleading with respect to the composition and therapeutic merit of a drug product and is considered to be unacceptable in most cases. The term must be examined in the total context of the labelling.
>
> Moreover, the term "maximum strength" may create an erroneous impression of a greater (or maximum) therapeutic benefit to the consumer. This may encourage the consumer to believe that only a higher dose of medication can provide adequate relief of the

symptoms, when often the regular strength product will provide sufficient relief.[9]

Thus, an advertisement is misleading where it "suggest[s] that an 'extra' strength product provides a greater benefit than a 'regular' strength product in cases where both are indicated for the same condition."[10]

25.     Here, Regular Strength Robitussin contains 20 mg of DMX Hbr and 200 mg of Guaifenesin per 10 ml.

26.     The adult dosage for Regular Strength Robitussin is **10 ml** every four hours.

27.     In a sleight of hand with words, Pfizer represents on the back side of the box for Maximum Strength Robitussin that it contains 20 mg of DMX Hbr and 400 mg of Guaifenesin per **20 ml.**

28.     However, the adult dosage for Maximum Strength Robitussin is 20 ml every four hours.

29.     A comparison of "apples to apples" from a dosage perspective, however, demonstrates that Maximum Strength Robitussin contains one-half the amount of DMX Hbr per 10 ml and the same amount of Guaifenesin per 10 ml as Regular Strength Robitussin:

| Product | Quantity of DMX Hbr per 10 ml | Quantity of Guaifenesin per 10 ml | Quantity of DMX Hbr per 20 ml | Quantity of Guaifenesin per 20 ml |
|---|---|---|---|---|
| Maximum Strength Robitussin | 10 mg | 200 mg | 20 mg | 400 mg |

[9] https://www.canada.ca/en/health-canada/services/drugs-health-products/drug-products/applications-submissions/guidance-documents/labelling-pharmaceutical-drugs-human-use-2014-guidance-document.html#a4102 (last accessed August 9, 2017).
[10] Minister of Health, Canada, "Issuance of the final Consumer Advertising Guidelines for Marketed Health Products (for Nonprescription Drugs including Natural Health Products) (Oct. 18, 200^), available at https://www.canada.ca/en/health-canada/services/drugs-health-products/regulatory-requirements-advertising/policies-guidance-documents/consumer-advertising-guidelines-marketed-health-products-nonprescription-drugs.html#a2.9 (last accessed August 10, 2017).

| Regular Strength Robitussin | 20mg | 200 mg | 40 mg | 400 mg |
|---|---|---|---|---|

30.    Accordingly, as reflected above, when comparing the same unit doses, Regular Strength Robitussin actually contains *more* or the same amount of the active ingredients than Maximum Strength Robitussin. In other words, Maximum Strength Robitussin is not, in fact, extra strength but exactly the same or a lesser strength than Regular Strength Robitussin.

31.    While Defendant may claim that Maximum Strength Robitussin does literally contain more if the consumer takes 20 ml as compared to the 10 ml dosage for Regular Strength Robitussin, the dosage instructions are merely a ploy to both charge more for Maximum Strength Robitussin on a single purchase as well as to cause the consumer to have to purchase the more-expensive Maximum Strength Robitussin more often. Based on the dosing instructions, Maximum Strength Robitussin provides just 5.91 doses whereas Regular Strength Robitussin provides 11.8 doses in a four-ounce bottle.

32.    The same dosing differential as between Regular Strength Robitussin and Maximum Strength appears in the 8 oz. version of the formulations.

**D.    Plaintiffs And The Class Were Damaged**

33.    Based on Pfizer's misleading and deceptive sales scheme, Pfizer was able to charge a premium for Maximum Strength Robitussin over the cost of Regular Strength Robitussin.

34.    In August 2017, Robitussin Cough+Chest Congestion DM cost the following at various retail stores:

| Product | Retailer | Price |
|---|---|---|
| **Regular Strength Robitussin (4 FL OZ)** | Walgreens | $7.99 |

- 9 -

|  | Walmart.com | $5.49 |
| --- | --- | --- |
| **Maximum Strength Robitussin (4 FL OZ)** | Walgreens | $9.49 |
|  | Walmart.com | $6.58 |

35.     Thus, Maximum Strength Robitussin typically costs more at retail than Regular Strength Robitussin. Like the Class, Plaintiffs paid an overcharge for the Maximum Strength product. Plaintiffs, as well as the Class they seek to represent, suffered economic damages as a result of purchasing Maximum Strength Robitussin.

## V.     CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Class defined as follows:

> All persons that paid for Maximum Strength Robitussin Cough+Chest Congestion DM for personal, family or household uses.

Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's legal representatives, predecessors, successors, assigns, and employees.

37.     The definition of the Class is unambiguous.  Plaintiffs are members of the Class that they seek to represent.  Class members can be notified of the class action through publication and direct mailings to address lists maintained in the usual course of business by Defendant and retail pharmacies.

38.     Class members are so numerous that their individual joinder is impracticable. The precise number of Class members is unknown to Plaintiffs, but it is clear that the number greatly exceeds the number to make joinder possible.

39.     Common questions of law and fact predominate over the questions affecting only individual Class members.  Some of the common legal and factual questions include:

a.      Whether "maximum strength" on a drug label means the product contains more of the active ingredient than in the regular version;

b.      Whether Pfizer's use of the phrase "Maximum Strength" for Maximum Strength Robitussin is deceptive and misleading when Maximum Strength Robitussin contains one-half the amount of cough suppressant per 10 ml and the same amount of expectorant per 10 ml as Regular Strength Robitussin;

c.      Whether Pfizer's conduct constitutes the act, use or employment of an unconscionable commercial practice, deceptive, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in violation of the New Jersey Consumer Fraud Act;

d..     Whether New Jersey law applies to the nationwide class;

e.      Whether Defendant violated consumer protection statutes and/or false advertising statutes and/or state deceptive business practices statutes;

f.      Whether Defendant violated the common law of unjust enrichment; and,

g.      The nature and extent of damages and other remedies to which the conduct of Defendant entitles the Class members.

40.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the Class members. Similar or identical statutory and common law violations and deceptive business practices are involved. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

010706-11 978236 V1

41.     The injuries sustained by the Class members flow, in each instance, from a common nucleus of operative facts – Defendant's misconduct.  In each case Defendant marketed and sold Maximum Strength Robitussin by misleading and deceiving Plaintiff and the Class that it contained more of the active ingredients than the regular strength version.

42.     The Class members have been damaged by Defendant's misconduct.  The Class members would not have purchased and/or would not have paid more for Maximum Strength Robitussin over the regular strength version in the absence of Defendant's marketing campaigns and deceptive scheme.

43.     Plaintiffs' claims are typical of the claims of the other Class members.  Plaintiffs paid for Maximum Strength Robitussin, and were actually deceived.

44.     Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are familiar with the basic facts that form the bases of the Class members' claims.  Plaintiffs' interests do not conflict with the interests of the other Class members that they seek to represent.  Plaintiffs have retained counsel competent and experienced in Class action litigation and intends to prosecute this action vigorously.  Plaintiffs' counsel has successfully prosecuted complex Class actions, including consumer protection Class actions.  Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class members.

45.     The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class members.  The relief sought per individual member of the Class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendant.  Furthermore, it would be virtually impossible for the Class members to seek redress on an individual basis.

010706-11 978236 V1

Even if the Class members themselves could afford such individual litigation, the court system could not.

46.     Individual litigation of the legal and factual issues raised by the conduct of Defendant would increase delay and expense to all parties and to the court system.  The Class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court. Given the similar nature of the Class members' claims and the absence of material differences in the state statutes and common laws upon which the Class members' claims are based, a nationwide Class will be easily managed by the Court and the parties.

## VI.     CAUSES OF ACTION

## COUNT I

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

47.     Plaintiffs restate and re-allege, and incorporate herein by reference, the preceding paragraphs as if fully set forth herein.

48.     At all relevant times, the New Jersey Consumer Fraud Act ("CFA") has prohibited consumer fraud in connection with the sale or advertisement of merchandise:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; provided, however, that nothing herein contained shall apply to the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher, or

- 13 -

> operator has no knowledge of the intent, design or purpose of the
> advertiser.

*See* C.F.A. § 56:8-2.

49.     Pursuant to the CFA, Defendant had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of Maximum Strength Robitussin to Plaintiffs and the proposed Class members.

50.     Defendant intended that Plaintiffs and the proposed Class members rely on its materially deceptive practices and purchase Maximum Strength Robitussin as a consequence of the deceptive practices, including Defendant's misrepresentations and omissions of material fact with respect to the actual strength of Maximum Strength Robitussin as compared to the regular version:

(a)     Defendant's labeling of Maximum Strength Robitussin as "maximum strength" was deceptive, unfair, and unlawful in that it does not contain more of the active ingredients per 10 ml as Regular Strength Robitussin; and

(b)     Defendant committed unlawful acts by promoting, advertising and selling Maximum Strength Robitussin in a manner that violated the Federal Food, Drug and Cosmetic Act.

51.     Defendant's deceptive representations and material omissions to Plaintiffs and the proposed Class members were, and are unfair and deceptive acts and practices.

52.     Defendant engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiff and the proposed Class members.

53.     Plaintiffs were deceived by Defendant's misrepresentations.

010706-11 978236 V1

54.     As a proximate result of the Defendant's misrepresentations, Plaintiffs and the proposed Class members have suffered an ascertainable loss, in an amount to be determined at trial.

## COUNT II

### ALTERNATIVE COUNT FOR VIOLATIONS OF
### STATE CONSUMER PROTECTION ACTS

55.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth here and further allege as follows:

56.     Count II is brought in the alternative by Plaintiffs, individually, and on behalf of all similarly situated residents of each of the 50 states for violations of the state consumer protection acts including:

a.      the Alaska Unfair Trade Practices And Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq*.;

b.      the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq*.;

c.      the Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq*.;

d.      the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq*. and 17500, *et seq*.;

e.      the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.;

f.      the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-101, *et seq*.;

g.      the Connecticut Unfair Trade Practices Act, Conn. Gen Stat. Ann. § 42-110, *et seq*.;

- 15 -

h. the Delaware Consumer Fraud Act, 6 Del. Code § 2513, *et seq.*;

i. the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*;

j. the Florida Deceptive And Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;

k. the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390, *et seq.*;

l. the Hawaii Unfair Competition Law, Haw. Rev. Stat. § 480-2, *et seq.*;

m. the Idaho Consumer Protection Act, Idaho Code. Ann. § 48-601, *et seq.*;

n. the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1, *et seq.*;

o. the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-2, *et seq.*;

p. the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623, *et seq.*;

q. the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

r. the Louisiana Unfair Trade Practices And Consumer Protection Law, LSA-R.S. 51:1401, *et seq.*;

s. the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. Tit. 5, § 207, *et seq.*;

t. the Maryland Consumer Protection Act, Md. Code Ann. Com. Law, § 13-301, *et seq.*;

010706-11 978236 V1

u.    the Massachusetts Regulation of Business Practices for Consumers Protection Act, Mass. Gen Laws Ann. Ch. 93A, *et seq*.;

v.    the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq*.;

w.    the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F, *et seq*.;

x.    the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407, *et seq*.;

y.    the Nebraska Consumer Protection Act, Neb. Rev. St. §§ 59-1601, *et seq*.;

z.    the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 41.600, *et seq*.

aa.    the New Hampshire Regulation of Business Practices For Consumer Protection, N.H. Rev. Stat. § 358-A:1, *et seq*.;

bb.    the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8, *et seq*.;

cc.    the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq*.;

dd.    the New York Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, *et seq*.;

ee.    the North Carolina Unfair And Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq*.;

ff.    the North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15, *et seq*.;

gg.    the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq*.;

hh.    the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15 § 751, *et seq*.;

ii.     the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605,

*et seq.*;

jj.     the Pennsylvania Unfair Trade Practices and Consumer Protection Law,

73 P.S. § 201-1, *et seq.*;

kk.     the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-

5.2(B), *et seq.*;

ll.     the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-

10, *et seq.*;

mm.     the South Dakota Deceptive Trade Practices and Consumer Protection,

S.D. Codified Laws § 37-24-1, *et seq.*;

nn.     the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101,

*et seq.*;

oo.     the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Code

Ann., Bus. & Con. § 17.41, *et seq.*;

pp.     the Utah Consumer Sales Practices Act, Utah Code. Ann. § 13-11-175, *et*

*seq.*;

qq.     the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq.*;

rr.     the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-199,

*et seq.*;

ss.     the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010,

*et seq.*;

tt.     the West Virginia Consumer Credit And Protection Act, W. Va. Code

§ 46A, *et seq.*;

- 18 -

uu.     the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq*.; and

vv.     the Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-101, *et seq*.

57.     The acts, practices, misrepresentations and omissions by Defendant described above, and Defendant's dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

58.     Defendant's acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived or damaged Plaintiffs and members of the Class in connection with the sale or advertisement of Maximum Strength Robitussin.  Defendant's conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

59.     Plaintiffs, on behalf of themselves and the other Class members, seek monetary damages, treble damages and such other and further relief as set forth in each of the above-enumerated statutes.

## COUNT III

## UNJUST ENRICHMENT

60.     Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

61.     At all times relevant hereto, Defendant designed, manufactured, produced, marketed and/or sold Maximum Strength Robitussin.

62.     Pfizer has benefitted from its unlawful acts by receiving payments for the sale of Maximum Strength Robitussin, which cost more per ounce and per dosage than Regular Strength Robitussin

63.     Plaintiffs and members of the Class conferred upon Defendant, without knowledge that Maximum Strength Robitussin was not actually maximum strength, payment for such product, benefits that were non-gratuitous.

64.     Defendant appreciated, or had knowledge of the non-gratuitous benefits conferred upon it by Plaintiffs and members of the Class.

65.     Defendant accepted or retained the non-gratuitous benefits conferred by Plaintiffs and members of the Class, with full knowledge and awareness that, as a result of Defendant's unconscionable wrongdoing, Plaintiffs and members of the Class were not receiving product of high quality, nature, fitness or value that had been represented by Defendant and reasonable consumers would have expected.  Retaining the non-gratuitous benefits conferred upon Defendant by Plaintiffs and members of the Class under these circumstances made Defendant's retention of the non-gratuitous benefits unjust and inequitable.

66.     Because Defendant's retention of the non-gratuitous benefits conferred by Plaintiffs and members of the Class is unjust and inequitable, Plaintiffs and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits in a manner established by the Court.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class members request that the Court enter an order or judgment against Defendant including the following:

- 20 -

a.      Certification of the action as a Class Action pursuant to Rule 23(b)(3) of the

Federal Rules of Civil Procedure, and appointment of Plaintiffs as Class Representatives and

their counsel of record as Class Counsel;

b.      Damages in the amount of monies paid for Maximum Strength Robitussin;

c.      Actual damages, statutory damages, punitive or treble damages, and such other

relief as provided by the statutes cited herein;

d.      Pre-judgment and post-judgment interest on such monetary relief;

e.      Other appropriate injunctive relief;

f.      The costs of bringing this suit, including reasonable attorneys' fees; and

g.      All other relief to which Plaintiff and members of the Class may be entitled at law

or in equity.

**JURY DEMAND**

Plaintiff hereby demands trial by jury on his own behalf and on behalf of Class members.


Dated: September 18, 2017

By /s/ *Elizabeth A. Fegan*
Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
(708) 628-4960

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292

Darren Malek
VERITAS LAW GROUP
Kalamazoo Building
5th Floor
107 W. Michigan Avenue

- 21 -

Kalamazoo, Michigan 49007
(269) 270-3500

010706-11 978236 V1