UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KARMEL AL HAJ, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) 17 C 6730 ) ) Judge Gary Feinerman |
| vs. | ) ) |
| PFIZER INC., | ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

On behalf of herself and a putative nationwide class, Karmel Al Haj alleges in this diversity suit that Pfizer Inc. deceived consumers by charging more for "Maximum Strength" Robitussin cough syrup than for "Regular Strength" Robitussin even though the former had a lower concentration of active ingredients than the latter. Doc. 1. In two prior opinions, familiarity with which is presumed, the court dismissed another plaintiff's claims for lack of personal jurisdiction and allowed Al Haj's individual and putative class claims to proceed. Docs. 59-60 (reported at 338 F. Supp. 3d 741 (N.D. Ill. 2018)); Docs. 82-83 (reported at 338 F. Supp. 3d 815 (N.D. Ill. 2018)). Pfizer now moves for summary judgment, Doc. 102, and Al Haj moves for class certification, Doc. 120. Pfizer's summary judgment motion is denied, and Al Haj's class certification motion is denied without prejudice to renewal in a manner that accounts for this opinion's discussion of her claims.

**Background**

The court recites the facts as favorably to Al Haj as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At

1

this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Pfizer's line of cough and congestion medications includes Robitussin Cough+Chest Congestion DM ("Regular Strength Robitussin") and Maximum Strength Robitussin Cough+Chest Congestion DM ("Maximum Strength Robitussin"). Doc. 142 at ¶ 5. Al Haj began purchasing Regular Strength Robitussin in 2011, but she later switched to Maximum Strength Robitussin, which she purchased in December 2016, February 2017, and April 2017. *Id*. at ¶¶ 22, 25, 39. When she made those purchases, Maximum Strength Robitussin cost some two dollars more than Regular Strength Robitussin. *Id*. at ¶ 33.

Throughout the relevant time period, Maximum Strength and Regular Strength Robitussin contained two active ingredients: dextromethorphan hydrobromide ("DXM Hbr"), a cough suppressant, and guaifenesin, an expectorant. *Id*. at ¶¶ 6, 13; 21 C.F.R. §§ 341.14(a)(4) (DXM Hbr), 341.18 (guaifenesin). Before June 2016, the recommended dosage of Maximum Strength Robitussin was 10 ml, and each 10 ml dose of Maximum Strength Robitussin contained the same amount of DXM Hbr (20 mg) but twice as much guaifenesin (400 mg) as the recommended 10 ml dose of Regular Strength Robitussin. Doc. 160 at ¶ 1. On June 20, 2016, as part of "Project Accelerate," Pfizer reformulated Maximum Strength Robitussin to change the recommended dose from 10 ml to 20 ml while keeping Regular Strength Robitussin's recommended dose at 10 ml. *Id*. at ¶¶ 1, 5; Doc. 142 at ¶¶ 6, 15.

By doubling the dosage size of Maximum Strength Robitussin (10 ml to 20 ml) but maintaining the level of active ingredients per dose (20 mg of DXM Hbr, 400 mg of guaifenesin), Pfizer's reformulation halved the product's concentration of active ingredients (2 mg to 1 mg of DXM Hbr per ml, 40 mg to 20 mg of guaifenesin per ml). Doc. 160 at ¶ 1. As a

2

result, until Pfizer in mid-2018 similarly doubled Regular Strength Robitussin's recommended dosage size from 10 ml to 20 ml and thereby halved its concentration of active ingredients, Maximum Strength Robitussin had the same concentration of guaifenesin but only half the concentration of DXM Hbr as Regular Strength Robitussin. *Ibid*.; Doc. 142 at ¶ 21. This table sets forth the pertinent figures:

**Table 1. Quantity of Active Ingredients per 10 ml of Robitussin**

|  | **Regular Strength (before mid-2018)** | **Maximum Strength (before June 2016)** | **Maximum Strength (after June 2016)** |
|---|---|---|---|
| **Guaifenesin** | 200 mg | 400 mg | 200 mg |
| **DXM Hbr** | 20 mg | 20 mg | 10 mg |

Thus, while a single dose of reformulated Maximum Strength Robitussin had twice as much guaifenesin and as much DXM Hbr as a single dose of Regular Strength Robitussin, that was because the recommended Maximum Strength dose was twice the volume (20 ml) of the recommended Regular Strength dose (10 ml). Doc. 160 at ¶ 1; Doc. 142 at ¶ 15. And because both products were sold in bottles of the same size, this meant that a bottle of Regular Strength Robitussin had twice as many doses as a bottle of Maximum Strength Robitussin. Doc. 160 at ¶¶ 1-2, 19. Despite this, Pfizer charged more for a bottle of Maximum Strength Robitussin than for a bottle of Regular Strength Robitussin. Doc. 142 at ¶ 33; Doc. 160 at ¶ 20. Indeed, an internal Pfizer presentation about Maximum Strength Robitussin's reformulation noted that doubling the dose would "[i]ncrease price/dose." Doc. 160 at ¶ 8 (alteration in original) (quoting Doc. 146-12 at 10). Pfizer staff touted the reduced number of doses per bottle of Maximum Strength Robitussin as a positive result of the reformulation. *Id*. at ¶¶ 9-10, 18-20.

Although Maximum Strength Robitussin's reformulation diluted the concentration of active ingredients, Pfizer retained the product's "Maximum Strength" designation and label because each 20 ml dose contained the maximum quantity of DXM Hbr and guaifenesin

3

permitted by applicable U.S. Food and Drug Administration ("FDA") regulations. Doc. 142 at ¶¶ 7, 13; *see* 21 C.F.R. §§ 341.74(d)(1)(iii) (DXM Hbr), 341.78(d) (guaifenesin). To alert customers that the reformulation doubled the recommended Maximum Strength dose, Pfizer placed a "See New Dosing" alert at the upper right corner of the product's box. Doc. 142 at ¶ 16; Doc. 160 at ¶ 31. Here are reproductions of the relevant boxes with a circle around the "See New Dosing" alert:

**Figure 1. Front of Maximum Strength and Regular Strength Robitussin Boxes**

  

Pre-Reformulation Maximum Strength Robitussin | Reformulated Maximum Strength Robitussin | Regular Strength Robitussin

The "Drug Facts" section on the back of the reformulated Maximum Strength box listed the recommended adult dose as 20 ml every four hours. Doc. 142 at ¶ 20. Beneath the Drug Facts, the packaging explained: "Maximum strength claim based on maximum levels of active ingredients per dose." *Ibid*. Nothing on the reformulated Maximum Strength Robitussin box referenced or compared the concentration of active ingredients in Regular Strength Robitussin.

4

Doc. 160 at ¶¶ 30-31. Here is a reproduction of the back of the reformulated Maximum Strength Robitussin box with circles around the dosage information and "Maximum Strength" explanation:

**Figure 2. Back of Reformulated Maximum Strength Robitussin Box**



Al Haj switched from Regular Strength Robitussin to Maximum Strength Robitussin after reading the "Maximum Strength" label and assuming that Maximum Strength Robitussin would be more effective than Regular Strength Robitussin. Doc. 160 at ¶¶ 65-67; Doc. 142 at ¶¶ 28, 32-33; Doc. 105-17 at 33, 104. The market research that Pfizer commissioned in connection with Project Accelerate had concluded that "quite a few" consumers would be willing to spend more on maximum strength medication because they perceive it to "work better and provide

5

more value" than regular strength medication. Doc. 160 at ¶¶ 33, 41, 43 (emphasis omitted) (quoting Doc. 146-54 at 9; Doc. 146-50 at 4). At her deposition, Al Haj did not recall any explanation on Maximum Strength Robitussin's packaging of what "Maximum Strength" means. Doc. 142 at ¶ 27; Doc. 105-17 at 53.

Al Haj did not compare in detail the Regular Strength and Maximum Strength packaging when she decided to purchase Maximum Strength Robitussin. Doc. 142 at ¶ 29; Doc. 105-17 at 52. She did not read the dosage information on the Maximum Strength box until she returned home after her purchase. Doc. 142 at ¶¶ 36-37; Doc. 105-17 at 58-59. Even after learning that the recommended dose was 20 ml, she purchased Maximum Strength Robitussin at least two more times despite knowing that its 20 ml dose was twice the recommended dose of Regular Strength Robitussin. Doc. 142 at ¶ 37.

Al Haj's family members felt better after taking Maximum Strength Robitussin. *Id*. at ¶ 34. Around the time she filed this lawsuit, Al Haj switched to a competitor's product, Delsym Cough+Chest Congestion DM. *Id*. at ¶ 41; Doc. 105-17 at 39. Delsym has the same recommended dose (20 ml) and the same amount of active ingredients per dose (20 mg DXM Hbr and 400 mg guaifenesin) as reformulated Maximum Strength Robitussin. Doc. 142 at ¶¶ 42-43. Al Haj's receipts show that she typically paid $9.96 for Maximum Strength Robitussin and between $11.97 and $16.99 for a smaller bottle of Delsym. *Id*. at ¶¶ 44-45.

**Discussion**

Al Haj claims that Pfizer's marketing and sale of Maximum Strength Robitussin violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*., and Illinois unjust enrichment law. Doc. 1 at ¶¶ 55-66.

I.  **ICFA Claim**

The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608 (7th Cir. 2013) (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)). The ICFA prohibits "deceptive business practices" as well as "business practices that, while not deceptive, are unfair." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 575 (7th Cir. 2012) (internal quotation marks omitted); *see also Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (recognizing that sales practices "that [allegedly] 'mislead,' 'misrepresent,' and 'defraud'" support a deceptive conduct claim). Al Haj brings only a deceptive conduct claim, alleging that Maximum Strength Robitussin's packaging misled her into believing that product had a higher concentration of active ingredients than Regular Strength Robitussin. Doc. 1 at ¶¶ 56, 58; Doc. 140 at 16. Having been allegedly misled in this manner, Al Haj purchased reformulated Maximum Strength Robitussin in 2016 and 2017 even though less expensive Regular Strength Robitussin at the time had a greater concentration of active ingredients. Doc. 160 at ¶ 1; Doc. 142 at ¶¶ 21, 33, 39.

"A deceptive[ conduct] claim under the ICFA has five elements: (1) the defendant undertook a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade or commerce; (4) actual damage to the plaintiff occurred; and (5) the damage complained of was proximately caused by the deception." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1000 (7th Cir. 2018) (internal quotation marks omitted). Focusing on the first, fourth, and fifth elements, Pfizer argues that no

7

reasonable jury could find that it engaged in deceptive conduct that proximately caused Al Haj to suffer pecuniary damage. Doc. 103 at 16-23.

A. **Whether Pfizer Engaged in a Deceptive Act or Practice**

To satisfy the first element of her ICFA claim and show that Pfizer's designation of Maximum Strength Robitussin as "Maximum Strength" was deceptive, Al Haj must adduce evidence sufficient for a reasonable jury to find that the designation "is either (1) literally false, or (2) likely to mislead (either through a statement or material omission) a reasonable consumer." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (internal quotation marks omitted); *see also Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001) ("Under the [ICFA], a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive."). "When analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 739 (7th Cir. 2017) (alteration and internal quotation marks omitted). "Overall, the determination whether an ad has a tendency to deceive is an impressionistic one more closely akin to a finding of fact than a conclusion of law." *Suchanek*, 764 F.3d at 762 (alteration and internal quotation marks omitted).

Pfizer acknowledges, Doc. 103 at 17, that the court denied its Rule 12(b)(6) motion on the ground that its designation of Maximum Strength Robitussin as "Maximum Strength" could have caused a reasonable consumer to misconstrue "an assertion about a product's relative strength ('Regular' vs. 'Maximum') as one that concerns the product's relative potency and therefore that depends on the *concentration* of the product's active ingredients, not the total *quantity* consumed." 338 F. Supp. 3d at 754. However, Pfizer urges the court to reach a different result here because the summary judgment record shows that the packaging Al Haj saw

8

included a "See New Dosing" alert on the front of the box and an explanation of "Maximum Strength" on the back. Doc. 103 at 17-18. According to Pfizer, those packaging features provided "Al Haj with critical context that cured any possible ambiguity about the meaning of the 'maximum strength' claim," *id*. at 18—*i.e.*, whether "Maximum Strength" referred to the amount of active ingredients allowed by the FDA or, rather, to the concentration of active ingredients as compared to the concentration in Regular Strength Robitussin.

Pfizer's contention fails to persuade, at least on summary judgment. Even if the "See New Dosing" alert would have led a reasonable consumer to read the 20 ml dosage information on the other side, the consumer would not have known that Maximum Strength Robitussin had a lower concentration of active ingredients than Regular Strength Robitussin unless she calculated and compared each product's concentration of DXM Hbr and guaifenesin. And as the court explained when denying Pfizer's Rule 12(b)(6) motion, "it is not reasonable to expect a consumer to cross-check a product's ingredient list against *another* product's list and then perform arithmetic to make sure she is comparing equivalent dosage volumes, all to ensure that the product she intends to purchase has the qualities it purports to have." 338 F. Supp. 3d at 756.

Instead of contending that a consumer should cross-check the Maximum Strength product's dosage information with that of the Regular Strength product, Pfizer argues that the packaging's backside explanation of "Maximum Strength" would preclude a reasonable consumer from understanding the "Maximum Strength" designation to be directed toward the relative potency of Regular Strength Robitussin. Doc. 103 at 18 ("[T]he packaging for the [Maximum Strength] products that [Al Haj] purchased expressly stated underneath the dosing information: 'Maximum strength claim based on maximum levels of active ingredients per dose.'") (quoting Doc. 142 at ¶ 20) (emphasis omitted). But using fine-print text to obliquely

walk back a prominent claim on the front of the box—particularly absent other product features that contextualize that claim, *see In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 348 F. Supp. 3d 797, 805 (N.D. Ill. 2018) (holding that "the phrase '100% Grated Parmesan Cheese'" must be understood "in the context of shelf-stable, unrefrigerated containers of cheese"); *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 910, 923 (N.D. Ill. 2017) (same)—generally does not preclude a jury finding that the frontside claim was deceptive. *See Garcia v. Overland Bond & Inv. Co.*, 668 N.E.2d 199, 204 (Ill. App. 1996) ("[W]e do not think that, as a matter of law, [the disclaimer] negates the net impression the advertisements make on the general populace … ."); *Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 988 (N.D. Ill. 2013) (holding that the defendant's "placement of the disclaimer on the back of the package in much smaller, barely legible type could have had the capacity to deceive consumers, who … were likely to focus their attention on the front of the package and its prominently featured 'Proven #1' claim") (citation and internal quotation marks omitted).

Pfizer retorts that its packaging never explicitly claimed that Maximum Strength Robitussin had a higher concentration of active ingredients than Regular Strength Robitussin. Doc. 158 at 9-12. To be deceptive, however, a package need "not contain literal falsehoods"; rather, it need only be "likely to mislead a reasonable consumer." *Suchanek*, 764 F.3d at 761-62; *see also Newman*, 885 F.3d at 1001 (reversing dismissal of an ICFA claim where the defendant's innocent understanding of its statements was "far from the only [understanding] that [wa]s possible"); *Aliano v. Ferriss*, 988 N.E.2d 168, 176 (Ill. App. 2013) ("It is well established that the test to be used in interpreting advertising is the net impression that it is likely to make on the general populace. It is immaterial that … a deception is accomplished by innuendo rather than by affirmative misstatement.") (alterations and internal quotation marks omitted). And by

10

placing a prominent "Maximum Strength" designation on what otherwise was materially the same frontside packaging as Regular Strength Robitussin, Pfizer invited consumers viewing both products to assume that a more expensive bottle of Maximum Strength Robitussin had a greater concentration of active ingredients than the bottle of Regular Strength Robitussin. *See Suchanek*, 764 F.3d at 762 (holding that packaging could be considered deceptive where it "implied" a comparison between the defendant's coffee pods and Keurig K-cups without disclosing that the defendant's product, unlike Keurig's product, was mostly instant coffee); *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992) (affirming a finding that Kraft created "a misleading impression" where its advertisement "implied[ly]" compared the calcium content of Kraft Singles, a processed cheese product, with the calcium content of five ounces of milk without disclosing "that much of the calcium" in Kraft Singles "is lost in processing"). After all, a reasonable consumer would conclude that she was being charged more for a bottle of Maximum Strength Robitussin than she would have paid for a bottle of Regular Strength Robitussin because the former had more potency per volume than the latter. 338 F. Supp. 3d at 755 ("[A] reasonable consumer would not expect that a product is fairly represented as 'Maximum Strength,' and is properly priced higher than its 'Regular Strength' cousin, if the consumer gets more of its active ingredients only by consuming more of it.").

In sum, Pfizer cannot create the reasonable impression that its "Maximum Strength" designation concerns relative potency and avoid liability with backside fine print that only indirectly (at best) disclaims that implication and obliquely references the FDA standards on which the "Maximum Strength" claim is based. *See Suchanek*, 764 F.3d at 762 (reversing summary judgment for the defendant where "the packaging contained numerous statements that implied the product was premium fresh" coffee, but "the package did not explain that it was little

more than instant coffee"); *see also Aliano*, 988 N.E.2d at 177 (holding that a defendant is subject to ICFA liability where its conduct "create[d] the likelihood of confusion or misunderstanding"); *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) ("[T]he reasonable consumer standard requires a probability that a significant portion of the consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.") (internal quotation marks omitted).

Pfizer attempts to analogize Al Haj's deceptive practices claim to the consumer protection claims dismissed in *In re 100% Grated Parmesan Cheese*. Doc. 103 at 17-18; Doc. 158 at 11-12. In *Parmesan*, this court held that a consumer viewing a cheese product's packaging as a whole, including the ingredient label expressly stating that the product contained cellulose, could not reasonably conclude that the "100% Grated Parmesan Cheese" claim on the front meant that the product was comprised of "100% cheese," 275 F. Supp. 3d at 923. Pfizer's invocation of *Parmesan* fails on two grounds.

First, unlike the cheese product in *Parmesan*, which remained "shelf-stable at room temperature," *ibid*., there is no commonsense, "observable" impediment to a consumer concluding that a bottle of Maximum Strength Robitussin has a higher concentration of active ingredients than Regular Strength Robitussin. 338 F. Supp. 3d at 756 ("It is reasonable to expect that a consumer would [examine the entire packaging], at least where something about the observable context of the product's retail presentation—shelf-stable, unrefrigerated cheese, for example, or shelf-stable, unrefrigerated orange juice—should prompt suspicion that the product might not be 100% cheese or fresh-squeezed juice.") (citing cases). Rather, a jury could conclude that the relative concentrations of active ingredients in Regular Strength and Maximum Strength Robitussin are more like the type of coffee in a coffee pod, *see Suchanek*, 764 F.3d at

762, or the calcium content of processed cheese, *see Kraft*, 970 F.2d at 322—non-obvious product qualities that consumers may reasonably rely on packages to clearly disclose.

Second, while "a quick skim of the ingredient label" on the backside of the packaging of the cheese product in *Parmesan* showed that the product contained "something other than cheese" and thereby cured any ambiguity about whether "100% Grated Parmesan Cheese" meant "100% cheese," 275 F. Supp. 3d at 923-24 (emphasis deleted), nothing on the backside of the Maximum Strength package likewise cured the "Maximum Strength" claim's ambiguity. Instead, a reasonable consumer would understand the significance of the backside's unexplained focus on a 20 ml *dose* of Maximum Strength Robitussin only after "cross-check[ing]" the two products' dosage information and "perform[ing] arithmetic" to ascertain the concentration of active ingredients in each bottle—something that a reasonable jury could find that a reasonable consumer should not be expected to do. 338 F. Supp. 3d at 756.

Accordingly, because "there are genuine questions of material fact" as to "whether the [Maximum Strength] packaging was" deceptive, a jury should "decid[e] the question whether the packaging was likely to mislead reasonable consumers." *Suchanek*, 764 F.3d at 762.

### B. Whether Al Haj Suffered Actual Pecuniary Damage

To satisfy the fourth element of her ICFA claim and show that she suffered "actual damage," Al Haj must adduce evidence sufficient for a reasonable jury to find that she "suffered actual pecuniary loss." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018); *see also Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) ("In … a private ICFA action brought by an individual consumer, actual loss may occur if the seller's deception deprives the plaintiff of the benefit of her bargain by causing her to pay more than the actual value of the property.") (internal quotation marks omitted). Pfizer asserts that Al Haj did not

suffer actual damage because she switched from Maximum Strength Robitussin to the more expensive Delsym product, not the less expensive Regular Strength Robitussin. Doc. 103 at 21-23; *see* Doc. 142 at ¶¶ 33, 45. Pfizer's assertion fails to persuade.

Even if Al Haj *eventually* abandoned Robitussin for a more expensive cough syrup, a reasonable jury still could find that she suffered "actual pecuniary loss" when she switched from Regular Strength to Maximum Strength Robitussin and thereby paid more for a product that had a lower concentration of active ingredients than its packaging implied. *See Camasta*, 761 F.3d at 740 (holding that an ICFA plaintiff can show actual damage where the product was "worth less than what [she] actually paid" or where she "could have shopped around and found a better price in the marketplace"); *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1196-97 (Ill. App. 2008) (explaining that actual damage is shown where "the plaintiff did not receive the benefit of the bargain" she thought she had acquired, with the damages "calculated by assessing the difference between actual value of the property sold and the value the property would have had at the time of the sale if the representations had been true"); *Hobbs v. Gerber Prods. Co.*, 2018 WL 3861571, at *9 (N.D. Ill. Aug. 14, 2018) (holding that if "the purchase would not have been made, at all, or at the same price, absent the" deception, then "at least some portion of the purchase [is] a loss") (collecting cases). In other words, Al Haj's injury—paying more for diluted medicine—"was established at the time of purchase, regardless of whether [s]he later was dissatisfied with" Robitussin "and regardless of whether [s]he would have purchased a substitute product." *Muir*, 983 F. Supp. 2d at 987; *see also Camasta*, 761 F.3d at 737-38 (explaining that events that occur "after" the relevant "purchase" are not dispositive of an ICFA claim).

Pressing the contrary result, Doc. 103 at 22-23; Doc. 158 at 19-20, Pfizer cites other cases where an ICFA plaintiff failed to establish actual pecuniary damage "because the prices

14

she paid were indeed lower than the prices at which she purportedly could have purchased comparable products in the marketplace." 888 N.E.2d at 1197; *see Kim*, 598 F.3d at 365 (affirming dismissal of an ICFA claim where the plaintiffs never alleged that "they could have shopped around and obtained a better price in the marketplace"); *Sabo v. WellPet, LLC*, 250 F. Supp. 3d 332, 337 (N.D. Ill. 2017) (dismissing an ICFA claim where the plaintiff failed to allege that the product was more expensive because it was "Made in the USA" or that "comparable … products that lacked domestic-source designations were less expensive"). Those cases are inapposite because the plaintiffs there could not establish that any comparable product was less expensive than what they paid, while Al Haj has adduced evidence that she could have paid less per active ingredient by purchasing Regular Strength instead of Maximum Strength Robitussin. *See Kim*, 598 F.3d at 365 (holding that a plaintiff can prove ICFA damages where "the value of what she received was less than the value of what she was promised") (quoting *Mulligan*, 888 N.E.2d at 1197); *Block v. Lifeway Foods, Inc.*, 2017 WL 3895565, at *5 (N.D. Ill. Sept. 6, 2017) (declining to dismiss an ICFA claim where the plaintiff alleged that he paid a "high premium" for kefir as compared to an equivalent volume of milk based on the misrepresentation that the "kefir [wa]s 99% lactose-free"); *Muir*, 983 F. Supp. 2d at 990 (holding that a plaintiff adequately pleaded "actual damages under the ICFA" where he "allege[d] that he was deprived of the benefit of the bargain because the … product was actually worth less than what it would have been worth had it actually been proven superior … to its competitors") (collecting cases).

Additionally, although Pfizer disputes that Regular Strength and Maximum Strength Robitussin are "comparable" products given that they have different amounts per dose of the same active ingredients, Doc. 158 at 20-21, a less expensive alternative need only be "similar," not identical, to serve as a comparator for purposes of establishing actual damage under the

15

ICFA.  *Camasta*, 761 F.3d at 740 (noting that the ICFA plaintiff could establish actual damage by showing that "he could have found a better price for *similar* shirts elsewhere") (emphasis added); *see also Block*, 2017 WL 3895565, at *5 (holding that "milk" and "kefir" are adequate comparators for purposes of establishing actual damage under the ICFA); *Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954, 958 (N.D. Ill. 2008) (suggesting that an ICFA plaintiff could plead actual damage by alleging "that she would have purchased cheaper lipstick").  A jury could reasonably conclude that Regular Strength Robitussin and Maximum Strength Robitussin are comparable cough syrups, especially because the close similarity between the two packages encouraged the comparison.

Accordingly, because Al Haj has adduced evidence sufficient for a reasonable jury to find that Maximum Strength Robitussin was "worth less than what [she] actually paid"—and even worth less than an equal volume of more potent Regular Strength Robitussin—her evidence of "actual damage" allows her to avoid summary judgment.  *Kim*, 598 F.3d at 365-66.

### C. Whether Pfizer's Conduct Proximately Caused Al Haj's Injury

To satisfy the fifth element of her ICFA claim and show that Pfizer's conduct "proximate[ly] cause[d]" her injury, Al Haj must show that Pfizer's "deceptive act [was] the 'but-for' cause of the damage," *Haywood*, 887 F.3d at 333-34 (quoting *Mulligan*, 888 N.E.2d at 1199), meaning that she was "actually … deceived" by Pfizer's designation of Maximum Strength Robitussin as "Maximum Strength," *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 822 (7th Cir. 2018) (quoting *De Bouse v. Bayer AG*, 922 N.E.2d 309, 316 (Ill. 2009)).  "Although proximate cause in an [ICFA] claim is typically an issue of fact, a court may determine it as a matter of law where only one conclusion is clearly evident."  *Haywood*, 887 F.3d at 334 (internal quotation marks omitted).

Pfizer submits that Al Haj cannot establish proximate cause because she admitted that she did not purchase Maximum Strength Robitussin under the "belief that the medication had a higher concentration of active ingredients per volume" than Regular Strength Robitussin. Doc. 103 at 19-21; *see* Doc. 142 at ¶¶ 30-31; Doc. 105-17 at 50-51. This argument fails, at least on summary judgment. Under governing precedent, "the ICFA does not require a plaintiff to show actual reliance or diligence in ascertaining the accuracy of misstatements." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005) (citation and internal quotation marks omitted); *see also Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996) ("Plaintiff's reliance is not an element of statutory consumer fraud, but a valid claim must show that the consumer fraud proximately caused plaintiff's injury.") (citations omitted). Instead, "to establish proximate causation," Al Haj need only show that "she was, *in some manner*, deceived by [Pfizer's] misrepresentation." *De Bouse*, 922 N.E.2d at 553 (emphasis added) (internal quotation marks omitted). Thus, to survive summary judgment, Al Haj need only "set forth sufficient evidence creating a genuine issue of material fact that 'but for' [Pfizer's] … conduct, [s]he would not have … purchased [Maximum Strength Robitussin] at artificially inflated prices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010).

Al Haj testified at her deposition that she bought Maximum Strength Robitussin because she thought "Maximum Strength" meant that she would "feel better [in] less days." Doc. 105-17 at 33; Doc. 142 at ¶ 28. Al Haj also testified that she understood Pfizer's "Maximum Strength" claim to mean that Maximum Strength Robitussin was more effective and a better value than Regular Strength Robitussin. Doc. 142 at ¶¶ 32-33; Doc. 105-17 at 52, 109. Although Pfizer contends that Al Haj admitted that she got what she paid for—a cough syrup with a more potent *dose*—her deposition testimony, "read in context," *Malin v. Hospira, Inc.*, 762 F.3d 552, 564

(7th Cir. 2014), and "in the light most favorable to" her, *Suchanek*, 764 F.3d at 762, would allow a reasonable jury to find that she expected a *bottle* of Maximum Strength Robitussin to be more potent and a better overall value than a bottle of Regular Strength Robitussin. Doc. 105-17 at 33 (Al Haj testifying: "So for me, it's extra money, extra dose, and you're not, like, feeling good in the time, you know, like, instead, four days you have to go buy it twice a week, you know, to get the same dose of the regular one. … I feel like I'm trapped, like I spend more money and for nothing, for not extra."). That is sufficient to establish proximate cause under the ICFA. *See Suchanek*, 764 F.3d at 762-63 (holding that a consumer fraud plaintiff may show proximate cause by adducing evidence "that [s]he read the words" or viewed an image "on the package and purchased [the product] in part based on the impressions [s]he gathered from the packaging").

      Pfizer also argues that Al Haj cannot show that its "Maximum Strength" claim continued to deceive her *after* she came home with her first purchase and realized the Maximum Strength dose was twice the volume of the Regular Strength dose. Doc. 103 at 20-21 ("Al Haj admitted that she bought [Maximum Strength Robitussin] again and again after learning that the dose was 20 ml."); *see* Doc. 142 at ¶ 37. True enough, a plaintiff who "knew the truth" about a product despite the defendant's misleading claims cannot show "proximate causation" under the ICFA. *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 164 (Ill. 2002); *see also Haywood*, 887 F.3d at 333 ("Because [the ICFA plaintiff] knew how long the massage would last [after her first visit], she cannot maintain a claim based on the second visit."). Yet even if Al Haj knew the recommended doses (20 ml vs. 10ml) of Maximum Strength and Regular Strength Robitussin after her first Maximum Strength purchase, a reasonable jury could find that the "Maximum Strength" claim proximately caused at least that first purchase. Moreover, as discussed, merely knowing each product's dosage was not enough to cure the alleged deception, as Al Haj still would need to

18

"perform arithmetic" and a "cross-check" based on each "product's ingredient list" to learn the concentration of active ingredients in each bottle. 338 F. Supp. 3d at 756.

In sum, because a reasonable jury on this record could conclude that Pfizer's "Maximum Strength" claim deceived Al Haj into purchasing and overpaying for Maximum Strength Robitussin, her ICFA claim survives summary judgment.

## II.     Unjust Enrichment Claim

Al Haj's unjust enrichment claim rests on the same allegedly deceptive conduct as her ICFA claim. Doc. 1 at ¶¶ 55-66; Doc. 140 at 30. "To [prove] a claim for unjust enrichment under Illinois law, 'a plaintiff must [show:] [1] that the defendant has unjustly retained a benefit to the plaintiff's detriment, and [2] that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Banco Panamericano, Inc. v. City of Peoria*, 880 F.3d 329, 333 (7th Cir. 2018) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)). Where, as here, "an unjust enrichment claim rests on the same improper conduct [underlying] another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Platt v. Brown*, 872 F.3d 848, 853 (7th Cir. 2017) (internal quotation marks omitted) (Illinois law); *see also Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust. What makes the retention of the benefit unjust is often due to some improper conduct by the defendant. And usually this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute.") (Illinois law).

Pfizer implicitly concedes that Al Haj's unjust enrichment claim rises or falls with her ICFA claim. Doc. 103 at 24 ("Al Haj's ICFA claim fails for multiple reasons; thus, Pfizer is also entitled to summary judgment on [her] claim for unjust enrichment."). In any event, Pfizer's alternative argument—that Al Haj cannot claim unjust enrichment because her family felt better after taking Maximum Strength Robitussin, Doc. 158 at 21-22—fails because she can show unjust enrichment by proving that Pfizer misled her into paying more for less potent (though not entirely ineffective) medicine. *See Siegel*, 612 F.3d at 937 (suggesting that a plaintiff who paid "too much" due to an ICFA violation may also claim unjust enrichment); *see also Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("Illinois courts have held that conduct rises to the level of *wrongful*, in the context of an unjust enrichment claim, when it violates the law."). Accordingly, because Al Haj's ICFA claim survives summary judgment, so does her unjust enrichment claim.

**Conclusion**

Pfizer's summary judgment motion is denied. Because the court's discussion of the record in this opinion might bear on whether Al Haj is an adequate class representative under Civil Rule 23(a)(4) or perhaps whether she can satisfy the other requirements for class certification, her class certification motion is denied without prejudice to renewal in a manner that accounts for that discussion.

July 16, 2019

_____
United States District Judge